In re NATIONAL CONSUMERS' EXCHANGE.

Petition of MARYLAND FINANCE CORPORATION.

(District Court, D. Maryland. March 30, 1922.)

1. Corporations ⬤�saf 415—President has no power to authorize mortgage of corporate property without authority of directors.

As a general rule, the president of a corporation has no power to mortgage its assets without the authority of the board of directors.

2. Corporations ⬤�saf 415—Mortgage executed by president of bankrupt corporation held invalid.

Where the by-laws of a corporation empowered its directors to authorize mortgages, a mortgage executed by the president, without the consent or even the knowledge of the directors, in favor of a lender which was in the business of making loans, and which retained from the face of the notes and mortgage, maturing in three months, a sum equivalent to interest at the rate of 70 per cent. per annum, and the proceeds of the mortgage were transferred by the president to his personal account, and were

not traced into any of the assets which came into the hands of the trustee in bankruptcy of the corporation, the mortgage is invalid against the trustee..

In Bankruptcy. In the matter of the National Consumers' Exchange, bankrupt. On petition of the Maryland Finance Corporation to establish a mortgage. Mortgage held invalid.

J. Wallace Bryan, of Baltimore, Md., for trustee.

William Stanley and Hershey, Machen, Donaldson & Williams, all of Baltimore, Md., for petitioner.

ROSE, District Judge. Early in January, 1920, the bankrupt obtained a Delaware charter, by which its authorized capital was fixed at $200,000. In October of the same year those who ran it went through the form of amending its certificate of incorporation, so that its permissible capital was raised to $5,000,000. Although it was incorporated in Delaware, and did business in Baltimore City, and apparently nowhere else, its few corporate meetings were held in Springfield, Mass., presumably because that had been the former home of one Hale, who was its promoter and its president. Such capital as it actually had came from the contributions of literally hundreds of stockholders, who were secured as the result of a door to door canvass in certain sections of this city. It is possible that as much as $70,000 in the aggregate may have been obtained from them. When in March, 1921, it was put into the hands of state court receivers, all this had disappeared, and it owed to unsecured creditors upwards of $20,000.

Almost all of its fixtures had been bought under conditional sales contracts, upon which so little had been paid that there was practically no valuable equity in them. In January, 1921, Hale, its president, had application made to the Maryland Finance Corporation, hereinafter called the petitioner, for a loan of $5,000, to be secured by a mortgage on all its property, except provisions, situate in its several stores in the city of Baltimore. The petitioner was told that some of the property was covered by conditional sales contracts and bills of sale, and that the greater portion of the loan would be applied to their payment. It was also told that the loan would be repaid out of the receipts of the subscription to the bankrupt's capital stock and from the income of its several stores. As the result, on the 1st day of February, Hale, in the name of the bankrupt, executed a chattel mortgage to the petitioner for $5,000, to secure a note for that amount, payable 3 months after date. The amount actually advanced was only $4,250, and Hale, for the bankrupt, therefor promised to pay $750 for the loan of $4,250 for three months, or at the rate of slightly over 70 per cent. per annum.

This mortgage was signed "National Consumers' Exchange, Inc., by D. Everett Hale, President." The bankrupt's corporate seal was also attached, attested by its assistant treasurer. The mortgage was never authorized at any meeting of the board of directors, and it does not appear that any director, other than Hale, ever knew anything about it. The by-laws of the corporation provided that:

"With the consent in writing and pursuant to the affirmative vote of the holders of a majority of the capital stock issued and outstanding, the directors

shall have authority to dispose in any manner of the whole property of the corporation."

"The directors are given power to authorize and cause to be executed mortgages and liens, without limit as to the amount, upon the property and franchises of the corporation."

By the same by-laws the—

"president is empowered to sign or countersign, as may be necessary, all such bills, notes, checks, contracts, and other instruments as might pertain to the business and affairs of the company, and he shall sign, when duly authorized, all contracts, orders, deeds, liens, licenses, and other instruments of a special nature."

The last meeting of either stockholders or directors had been held in October, 1920. The mortgage was then not even in contemplation, and of course not mentioned at the meeting. At the time it was executed a majority at least of the directors were residents of Baltimore City. It does not appear, however, that any of them were formally or informally consulted about it. No mortgage, other than the one now in controversy, was ever made by the corporation. Not until shortly before the bankruptcy did Hale ever execute any notes in the corporate name, and they were issued to take up money which he personally borrowed from individuals, and which he says he had relent to the bankrupt.

[1, 2] All the authorities and all the text-writers agree that, as a general rule, the president of a corporation has no power to mortgage its assets, without the authority of the board of directors. If there ever was a case in which this rule should be applied, it is the one at bar. Neither directors nor stockholders had any actual knowledge of the making of the mortgage. There was no previous practice which might have led others to assume that the president had the authority which he undertook to exercise. Moreover, the lender was in the business of making loans. It would have been easy for it to have seen to it that all proper formalities had been observed. The disproportionate compensation it was receiving for the advance it was making should have warned it to be careful as to what it was doing. It would have been a simple matter to have called for a production of the by-laws of the bankrupt, and to have declined to make the loan until proper authority had been given for its execution. The $4,250, advanced by the petitioner, was almost immediately transferred by Hale to his personal account. If his story is believed, it was used to pay certain preexisting debts of the bankrupt. None of it is traced into any of the assets which came into the hands of the trustee in bankruptcy.

It follows that the mortgage must be held invalid.